### Application of MURRA.
### No. 9809.

United States Court of Appeals
Seventh Circuit.
Dec. 14, 1949.
Rehearing Denied Jan. 31, 1950.

---

William H. King, Jr., Richard H. Merrick, Chicago, Ill., Henry Heineman, Chicago, Ill., for appellant.

Hon. Otto Kerner, Jr., U. S. Attorney, John Peter Lulinski and C. Wylie Allen, Asst. U. S. Attys. Chicago, Illinois (Dewey G. Hutchinson, Chicago, Ill., of counsel), for appellee.

Before MAJOR, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This is an appeal from an order entered November 23, 1948, denying the naturalization petition of John Victor Murra. The petition was filed November 21, 1944, and took what may be termed its usual course. It came on for final hearing in open court, and on January 17, 1947, his petition was denied and dismissed. From this order an appeal was taken to this court, wherein the order was reversed with directions that the court make its findings of fact and conclusions, as required by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A. Application of Murra, 7 Cir., 166 F. 2d 605.

Thereupon, the court made its findings of fact and entered its conclusions of law, but upon precisely the same record as the court had before it in the first instance. That record contains two exhibits introduced by the government, one containing the testimony of Murra taken at a hearing before a Naturalization Examiner on June 4, 1946, and the other the testimony of Murra and other witnesses taken before a Naturalization Examiner on October 11, 1946. Thus, there is contained in the record the testimony given by Murra on three different occasions, twice before an Examiner and once at the hearing on his petition in open court. On the former appeal, this court held that the testimony taken before an Examiner was irrelevant where the petition was heard in open court. Relative to such hearing we stated 166 F. 2d at page 607:

"Thus, the hearing before the court is not for the purpose of reviewing the recommendations of the Examiner; it is a hearing de novo and it is obvious that the court must decide the issues upon the testimony which it hears, and that neither the testimony heard by the Examiner, his findings, nor his recommendation are of any consequence."

■ While we have given further thought to the conclusion thus reached, we see no reason to retract it. We refer to this matter at this point for the reason that the government on the instant appeal fails to distinguish between the testimony which was given before the Examiner and that heard in open court, and the court below in its findings also to some extent failed to make such distinction.

In view of the findings subsequently referred to, made in response to our previous direction, as well as the argument here relied upon by the government, we think a further construction of Sec. 307(a) of the Nationality Act of 1940, 54 Stat. 1142, 8 U.S.C.A. § 707(a), is required, insofar as it relates to the length of time during which a petitioner must meet the conditions thereby imposed. The statutory provision so far as presently material provides in substance that no person shall be naturalized unless "immediately preceding the date of filing petition for naturalization", he has for at least five years "been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

The government contends that this provision "fixes the minimum requirements that a petitioner for naturalization must meet, but the naturalization court may inquire into the entire life history of the petitioner to ascertain his true character and inclinations and it is incumbent upon the petitioner for naturalization to answer all pertinent questions and to honestly and truthfully disclose the facts bearing on his moral conduct." A number of district court opinions are cited in support of this contention, the most relevant being In re Taran, D.C., 52 F.Supp. 535; Petition of Gabin, D.C.,

60 F.Supp. 750; In re Balestrieri, D.C., 59 F.Supp. 181. This theory of the government and of the cases which support it is contrary to the overwhelming weight of authority.

In Petition of Zele, 2 Cir., 140 F.2d 773, 776, the court stated:

"Under the law the burden is on the petitioner to establish good moral character only during the five-year period, not earlier. Petition of Zele, 2 Cir., 127 F.2d 578; United States v. Clifford, 2 Cir., 89 F.2d 184; United States v. Rubia, 5 Cir., 110 F.2d 92; In re Aldecoa, D.C.Idaho, 22 F. Supp. 659, 661. And it has consistently been construed liberally so as to sanction forgiveness after the expiration of five years from the date of a disbarring misdeed. In re Trum, D.C.W.D.Mo., 199 F. 361; In re Centi, D.C.W.D.Tenn., 217 F. 833; In re Guliano, D.C.S.D.N.Y., 156 F. 420; United States v. Mirsky, D.C.S.D.N. Y., 17 F.2d 275; In re Nagy, D.C.S.D. Tex., 3 F.2d 77; Application of Polivka, D. C.W.D.Pa., 30 F.Supp. 67. See, also, In re Schlau, 2 Cir., 136 F.2d 480."

In Schwab v. Coleman, 4 Cir., 145 F.2d 672, 675, 156 A.L.R. 355, the court stated:

"The statute in its general provisions requires five years residence and proof of good character and attachment to the Constitution during such period [citing statute]; and there is nothing in the provision as to naturalization of aliens which requires proof with respect to matters prior to such five year period."

And on the following page the court expressed the view that to hold otherwise "is not only to add to the requirements which the applicant must meet a condition which Congress has not imposed, but is also, in so far as the condition is insisted on, to nullify the provision of the statute which permits the naturalization of enemy aliens."

Section 305 of the Naturalization Act, Title 8 U.S.C.A. § 705, prescribes a time limitation "within a period of ten years immediately preceding the filing of the petition for naturalization." It will be observed that this time element is exactly the same as that contained in the section under

consideration, except there it is ten years while here it is five. In United States v. Waskowski, 7 Cir., 158 F.2d 962, in passing on the qualification of an applicant for naturalization, this court held, contrary to the contention of the government, that it could not go beyond this ten year period. In doing so, we stated 158 F.2d at page 963: "But, as we interpret Congress' intent, the court is not permitted to go back more than 10 years preceding the filing of the application to determine whether the applicant is a member of or affiliated with a proscribed organization but is permitted to disqualify him only if that disqualifying factor has existed within 10 years prior to the filing of the petition." The court further stated that it was "the evident intent of Congress that any disqualification occurring more than 10 years prior to the date of the filing of his application and not existing within the 10-year period is insufficient to disqualify him." What the court said and held regarding this ten year limitation provision is equally applicable to the five year provision before us.

Other cases which have held in one form or another that the government in its inquiry as to the fitness of an applicant for naturalization is confined to the five year period immediately preceding the filing of the petition for naturalization are United States v. Rubia, 5 Cir., 110 F.2d 92, 93; Petition of Zele, 2 Cir., 127 F.2d 578, 580; United States v. Francioso, 2 Cir., 164 F.2d 163; Repouille v. United States, 2 Cir., 165 F.2d 152, 153; Daddona v. United States, 2 Cir., 170 F.2d 964, 965. (See also other cases which the courts in these cases have cited.)

We are of the view that these numerous courts have correctly construed the provision in question. The wording of the statute itself leaves little room for doubt. If a five year period is a "minimum requirement," as the government argues, it becomes meaningless. If the time fixed by Congress is "minimum," then it would seem to follow that the maximum time would be during all of the petitioner's life. We cannot believe that Congress meant other than what it said, that is, that if a petitioner meets the enumerated requirements for a period of five years immediately prior to the filing of his petition he is entitled to be admitted. We need not decide that a court is never justified in making inquiry concerning a petitioner previous to the five year period, but what we do think and hold is that even so the facts developed by such an inquiry cannot be used as the basis for disqualification.

As stated, the petition in question was filed November 21, 1944. Thus, the relevant period of inquiry as to petitioner's activities, conduct, statements, etc., must be that which took place within the five year period immediately prior to that date, or during the period between November 21, 1939 and November 21, 1944. We have purposely construed this time element in the beginning because much of the evidence upon which the government relies has to do with matters previous, and some of it long previous, to the relevant period of inquiry. We shall not relate such testimony found in the government's brief but shall go to the court's findings, which disclose to a large extent the same erroneous conception as that indulged in by the government.

The court's findings of fact are contained in two paragraphs, and we think they should be set forth. In paragraph 1, it is found:

"That the petitioner, John Victor Murra, has failed to establish that he has been attached to the principles of the Constitution, and well disposed to the good order and happiness of the United States for the period required by law for the reason that he attended meetings of the Communist Party from January, 1935 to July, 1936; that in 1935 he associated with and was influenced by Communists; that on June 20, 1935 and July 28, 1935 he was arrested in the City of Chicago for inciting race disturbances; that in February, 1937 he left the United States at the instigation of Communist associates to fight with a foreign army in Spain where he remained until the fall of 1939, and that on June 4, 1946 he refused to answer material questions relevant to his qualifications for ad-

mission to citizenship in the United States of America."

Upon this finding the court concluded as a matter of law that the petition should be denied "for the reason that he has failed to establish that he has been attached to the principles of the Constitution, and well disposed to the good order and happiness of the United States for the period required by law."

As will be noted, every finding contained in paragraph 1 relates to matters and incidents which occurred prior to November 21, 1939, except the last sentence of the paragraph, "and that on June 4, 1946, he refused to answer material questions relevant to his qualifications for admission to citizenship in the United States of America." This thus becomes the sole fact as found which affords any basis for the conclusion of law based thereon. The claimed refusal to answer material questions on June 4, 1946 was during a preliminary hearing by the Naturalization Examiner, as shown by the Examiner's report which under our previous holding was not properly before the court. At any rate, petitioner in the hearing before the court took the stand and was subjected to cross-examination by the government. At this hearing there was no refusal on his part to answer questions and no effort on the part of the government to impeach him on account of conflicting statements made before the Examiner. Moreover, if such refusals be considered, we think they are of little if any significance. They had to do with incidents relative to petitioner's moral character (subsequently to be considered). The first was that after admitting that he had lived with his present wife before marriage he was asked, "For what period of time?" and petitioner stated, "I don't think that is relevant, sir. I don't think I can answer that without involving my wife. I intended marriage. I had known it for a long time." The other refusal had to do with the divorce obtained by a previous wife. When petitioner's attention was called to the divorce decree which showed that his previous wife had divorced him on the ground of extreme and repeated cruelty, he was asked, "Is there any truth in that allegation?" and petitioner stated, "I have not contested this divorce, and will just stand on that ground and have nothing else to say."

■ We would hardly think that this finding as to a refusal to answer questions, even if properly before the court, could form a basis for a denial of constitutional attachment or as proof that he was not well disposed to the good order and happiness of the United States. And we do not suppose that the court so concluded. It is obvious that his conclusion of law was predicated upon matters contained in the first paragraph of the findings, which occurred prior to the applicable time limitation. We think clearly that the conclusion of the court in this respect cannot be upheld.

This brings us to paragraph 2 of the court's findings of fact, in which it is found: ·

"That the petitioner, John Victor Murra, has failed to establish good moral character during the period required by law for the reason that in 1935 or 1936 he had a girl in his dormitory room at the University of Chicago in Chicago, Illinois; that he was found guilty by a court of competent jurisdiction of extreme and repeated cruelty to his wife on November 21, 1939 and again on December 27, 1939; that for a period immediately prior to February 17, 1946 he lived together with a woman in an open state of fornication in violation of Chapter 38, Section 46 of the Illinois Statutes, and in his naturalization proceedings he refused to answer as to how long his living in this open state of fornication existed."

■ Predicated upon this finding the court concluded as a matter of law that the petition should be denied "for the reason that he has failed to establish good moral character during the period required by law." The dormitory episode referred to occurred three or four years prior to the commencement of the five year period and is of such frivolous nature that it could have no bearing whenever it occurred. Briefly, the record discloses that petitioner while a student at the University of Chicago took a girl to his room in the dormitory.

This was a violation of the rules, for which he was reprimanded. There is no proof of any immoral or improper conduct on his part other than a violation of the rules.

Thus, only two matters are left which can form any substantial basis for the court's refusal to allow the petition, (1) that petitioner's first wife obtained a divorce from him in an Illinois court on the ground of "extreme and repeated cruelty * * * on November 21, 1939 and again on December 27, 1939" (the first of these acts was exactly five years before the filing of the petition), and (2) that for a period "immediately prior to February 17, 1946 he lived together with a woman in an open state of fornication."

This seems to be an appropriate point to make some observation concerning the petitioner. He was born in Odessa, Russia, August 24, 1916, and when four years old was taken by his parents to Roumania, where he remained until he was eighteen years of age. Because he was Jewish many restrictions and conditions were imposed upon him not common to the citizenry in general. In 1934, at the age of 18, he came to the United States on a temporary student passport, and in January, 1935, registered as a student in the University of Chicago. His father supplied some funds for his education, but in the main he was self-supporting. In 1936, he was graduated as a Bachelor of Sociology but continued to do graduate work until February, 1937. In February, 1937, he left this country for Spain and there joined the forces of what was known as the Republican Government then sought to be overthrown by Franco. He was given the rank of infantry corporal in the 15th Brigade, known as the Abraham Lincoln Brigade, and because he could speak six languages, including Spanish, was assigned as interpreter. Having been wounded, he was sent to France in January, 1939, and later he returned to the United States.

The Certificate of Arrival issued by the Commissioner of Immigration certifies that he was lawfully admitted to the United States for permanent residence as of June 3, 1939. He at once returned to the University of Chicago to continue his studies, and by 1941 had completed two years of full-time graduate work. In the winter of that time he passed his doctor's examinations. He was the recipient of numerous awards and fellowships. He registered under the Selective Service Act, 50 U.S.C.A. Appendix, § 301 et seq., and was placed in class 4-F (physically unfit). During 1941, he volunteered to his Selective Service Board for military service but was rejected for physical reasons. In 1941, he took advantage of a scholarship offered to him, and on August 15 of that year he went on a research expedition to Ecuador, sent out by a Board working with Nelson Rockefeller. He returned to the United States in February, 1942, and spent six months at the Field Museum, when he accepted a position with the Institute of Human Relations at Yale University. In January, 1944, he returned to Chicago, where he accepted a position as instructor at the University of Chicago in which capacity he served until June, 1946. In the summer of 1946, he taught at the University of Wisconsin and served as a student advisor.

Petitioner was married twice. On July 25, 1936, after his graduation, he was married to Virginia Miller, a classmate. On July 15, 1940, this wife obtained a divorce in an uncontested case based upon the ground of cruelty, two acts of cruelty being alleged, as required by Illinois law. At the hearing petitioner was not asked either on direct or cross-examination what such acts consisted of. (As already shown, petitioner refused to answer certain questions in this respect at a hearing before the Examiner.) He met his second wife, Elizabeth Ann Sawyer, in the spring of 1944 and was married to her in Chicago on February 17, 1946. He lived with her before marriage for a short period, how long the record does not show definitely but the time indicated was five or six weeks previous to marriage.

As our former opinion shows, a hearing was had in open court. A number of witnesses testified on behalf of petitioner. He himself was a witness and answered all questions propounded to him by the court or counsel. The government offered no

witnesses but, as our former opinion discloses, relied upon the report of the Naturalization Examiner and a transcript of testimony adduced before such Examiner but not in the presence of the court. Some eight witnesses appeared for and testified on behalf of the petitioner. They included Fay-Cooper Cole, a professor at the University of Chicago, who was an intimate acquaintance and associate of petitioner and who was present at the time of his second marriage; Robert Redfield, a professor at the University of Chicago and former Dean of the Division of Social Science, who was personally acquainted with the petitioner as a student, colleague and friend; Donald Collier, curator at the Field Museum in the Department of Anthropology, who was also personally and intimately acquainted with petitioner and who spent five months with him on the trip to Ecuador; Moreau Maxwell, an assistant supervisor of the University of Wisconsin, who was acquainted with petitioner since 1940 and who worked with him on numerous projects and undertakings; Conrad B. Bentzen, a University of Chicago student who knew petitioner since 1939 and was socially intimate with him as a student and at clubs; George Irving Quimby, connected with the University of Chicago and employed by the Field Museum, also intimately acquainted with petitioner, having often been a visitor in his home.

All of these witnesses expressed the opinion that petitioner would make a good citizen and vouched for his moral qualification in unmistakable terms. In addition and of greater significance is the testimony of Charles M. Sawyer and Isabel H. Miller. The former was a graduate of the United States Military Academy and was at the time of the hearing a retired army officer. He was petitioner's father-in-law (father of petitioner's second wife). He testified that he had been intimately acquainted with petitioner for four years. When asked as to petitioner's moral character he answered, "Well, in the Army we know people as good, they are good and excellent and I would rate Mr. Murra as excellent." Mrs. Miller was petitioner's mother-in-law (mother of his first wife). She was a re-tired school teacher, and had taught in the Chicago public schools for nearly forty years. Her personal acquaintance with him dated back previous to his marriage to her daughter. After such marriage she was often in their home and they in hers. The following extract from her testimony is revealing: "Q. Have you any opinion about Mr. Murra's character?" "A. Oh, yes, it is of the highest." "Q. You think it is of the highest character?" "A. Yes. I do."

A detailed narration of the testimony of these witnesses, persons of standing and prominence, would serve no useful purpose. It is sufficient to note that it constituted an impressive showing in behalf of petitioner's qualifications to become a citizen, and it was an evaluation by those who knew him best and whose opinions are, therefore, entitled to respect. The sole discordant note to this favorable showing in petitioner's behalf are the two incidents found by the court, (1) that his former wife obtained a divorce upon the grounds of extreme and repeated cruelty, and (2) that he lived with his second wife a short time before their marriage.

As already noted, only one of the acts of cruelty found in the divorce decree occurred within the five year period. What that act consisted of is not shown. The decree, while apparently in the possession of the government, was not introduced in evidence and neither was the petitioner cross-examined at the hearing concerning the acts recited. We have serious doubt if anyone familiar with the practice in the Illinois divorce courts would regard an uncontested divorce decree on the ground of cruelty as a reliable indicator of the defendant's morals, particularly without information as to what the acts of cruelty consisted of. And if the acts of decreed cruelty had been serious in their nature, it is hardly conceivable that petitioner's mother-in-law, the mother of the woman against whom such acts were found to have been committed, would testify that the man who had thus wronged her daughter was of the "highest character."

As we view the case, the only serious question arises from the finding that "for

a period immediately prior to February 17, 1946 he lived together with a woman in an open state of fornication," in violation of the Illinois statute. We find nothing in the record to show that petitioner lived with a woman "in an open state of fornication." So far as we can ascertain, it could either have been open and notorious or it could have been in secrecy. And the finding also fails to recite that the woman with whom he thus lived became his wife by lawful marriage on February 17, 1946. The only testimony concerning this incident is that of petitioner, which we set forth in a footnote.[1] From this testimony it appears that petitioner lived with his second wife prior to their marriage four or five weeks.

We suppose that what constitutes "good moral character," as contemplated by the Naturalization Act, cannot be determined in any precise fashion; in fact, it is evident from a reading of the cases, especially those of courts of review, that it is a matter of opinion which varies quite widely. The government cites a number of cases, the most important of which are Estrin v. United States, 2 Cir., 80 F.2d 105, Jaselski v. United States, 79 N.E.2d 621, 400 Ill. 289, and Calo v. United States, 400 Ill. 329, 79 N.E.2d 619.

In the Estrin case, the court reversed an order admitting the petitioner on the ground that during the five year period he had committed adultery, in violation of a criminal statute of the State of New York, and which formed the basis for a divorce granted to his wife. In doing so, however, the court stated 80 F.2d at page 105:

"Whether there might be extenuating circumstances under which a single lapse from marital fidelity should not be deemed to outweigh an applicant's general habits of conforming to the common standards of morality, we need not consider, for none such were advanced by the petitioner."

Moreover, this holding was distinguished by the same court in Petitions of Rudder et al., 2 Cir., 159 F.2d 695, where there were three petitioners involved and where the order of admission as to all was approved. All of these petitioners lived with women in an open state of adultery. Petitioner Rudder lived with a woman, had a child by her and was subsequently married to her; petitioner Mengler lived with a married woman separated from her husband and married her after she obtained a divorce; petitioner Jannibelli lived with a woman while he had a wife living, by whom he had had four children, and he was not married to the woman with whom he lived because of his inability to obtain a divorce from his wife. The court, in approving their admission, stated, 159 F.2d at page 698:

"Because of the permanence, stability and apparent respectability of the relationships involved in the cases at bar, we think the trial judge did not err in ruling that the several petitioners were not disqualified for citizenship."

In the Calo case, supra, the Illinois Supreme Court reversed an order of admission where the petitioner committed adultery within five years of the time he filed his petition, and where the adulterous relation was continued after the filing of the petition. In the Jaselski case, supra,

---

**1.** "A. The next time I married was eleven months ago, just today, the 17th of February, 1946.

"Q. Who is your present wife? A. My present wife is Elizabeth Ann Sawyer.

"Q. Where did you first learn to know her? A. I met Miss Sawyer in 1944, sometime in the spring of 1944.

"Q. When did you subsequently become engaged to her? A. In the fall of 1945 I went to see her and spent a week in Seattle where she was at that time and we became formally engaged.

"Q. Where did you next meet? A. I met her the next time when I proposed to her at her parents, when I saw her in Baltimore where her parents were at that time.

"Q. When was that? A. Just after Christmas last year, Christmas, 1945.

"Q. When did you first—where did you first live as man and wife? A. I returned to Chicago for my teaching duties in the early part of January and she joined me in the middle of January and we were married in February."

the Illinois Supreme Court also reversed an order of admission, where the petitioner lived with a woman as husband and wife continuously for a period of some fourteen years. It is at once apparent that there is a marked contrast in the situation in both of the cases before the Illinois court and the present case, because in both of those cases the adulterous relation was long continued and no marriage was consummated by the petitioners in either case. The government here contends that these decisions point to the "standards of morals for this state." It might also be observed that the policy of Illinois is to forgive parties living even in an open state of adultery or fornication by their subsequent intermarriage. Sec. 46, Chap. 38, Smith-Hurd Ill. Ann.Stats.

In United States v. Rubia, 5 Cir., 110 F. 2d 92, the court approved the admission of petitioner over the objection of the Examiner because he lived with a married woman not his wife six months prior to the filing of his petition.

In United States v. Francioso, 2 Cir., 164 F.2d 163, the court approved an order of admission where the petitioner married his niece with knowledge that the marriage was unlawful under the laws of the State of Connecticut, and that such marriage ceremony could not have been performed if their relationship had not been suppressed.

In the quite recent case of Schmidt v. United States, 2 Cir., 1949, 177 F.2d 450, 452, the court reversed an order of the District Court which had denied a petition for naturalization on the ground that petitioner had failed to establish that he was a person of "good moral character" for the five years preceding the filing of his petition. The evidence which the District Court relied upon for denial was based upon petitioner's statement to an Examiner that he had had sexual intercourse with women during the five year period. The court held that the admissions thus made to the Examiner were not sufficient to show that he was not a person of "good moral character."

Two other recent cases where orders of admission were affirmed are United States v. Manfredi, 3 Cir., 168 F.2d 752, and United ed States v. Palombella, 3 Cir., 168 F.2d 903. Both of these affirmances were by the Third Circuit and each without opinion, by an equally divided court of six judges, and if an opinion was written in either case by the respective District Courts it has not been called to our attention. However, the court in Schmidt v. United States, supra, in referring to these two cases stated: "In the first case, an unmarried man admitted that he had had occasional meretricious relations with a single woman for pay; in the second case, the facts were the same, except that the alien had a wife and children in Italy, from whom he had apparently not been legally separated."

■ A review of these cases discloses the wide disparity of opinion as to the extent of moral delinquency sufficient to bar an alien from naturalization. And while they are not too helpful as an aid to a solution of the instant problem, they do disclose the length, in some instances apparently extreme, to which courts have gone in approving admission in spite of some moral deficiency. In most of the cases referred to, the situation was less favorable to the petitioner than it is here, because whatever may be thought of petitioner's transgression against the moral code, he did all within his power to rectify the wrong by making the woman his lawful wife and has subsequently, so far as the record discloses, lived in the approved manner as husband and wife. It is our opinion that petitioner's indiscretion upon which the government relies to show that he was not a person of "good moral character", when considered in the light of the entire record is not sufficient to bar his admission.

The order appealed from is reversed and the cause remanded, with directions that his petition be allowed.