Krystyna PLEWA, Plaintiff,

v.

**IMMIGRATION AND NATURALIZATION SERVICE and Doris Meissner, Commissioner, Immigration and Naturalization Service, Defendant.**

No. 99 C 302.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 21, 1999.

Richard J. Puchalski, Sklodowski, Puchalski & Reimer, Chicago, IL, for plaintiff.

James G. Hoofnagle, Kathryn A. Kelly, Special Assistant U.S. Attorney, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

DENLOW, United States Magistrate Judge.

The Court conducted a one-day bench trial on December 13, 1999, to decide whether Krystyna Plewa ("Plaintiff") is a person of good moral character so as to be entitled to become a citizen of the United States. The Court has carefully considered the testimony of the seven witnesses who testified at trial, the exhibits introduced into evidence, the written submissions of the parties, and the closing arguments of counsel. The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall be considered findings. See *Miller v. Fenton*, 474 U.S. 104, 113–114, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## I. FINDINGS OF FACTS

**A. The Parties.**

1. Plaintiff is a forty-four year old resident of Hickory Hills, Illinois. Plaintiff was born in Poland and has been a lawful permanent resident of the United States since July 20, 1976. She is married to a United States citizen and has two children, ages 17 and 18, who were born in the United States and are United States citizens.

2. Defendant Immigration and Naturalization Service ("INS") is responsible for reviewing applications for naturalization.

**B. Background Facts.**

3. Plaintiff and her husband, Andrzej Plewa, own and operate Andy's Bar at 5734 South Pulaski in Chicago, Illinois.

4. According to three character witnesses, Plaintiff is a fine upstanding person of good moral character. Her sister-in-law, Jane Plewa, testified that Plaintiff has instilled good values in her children, regularly attends church and helps the poor. Raymond Burns, a retired Chicago Police Officer, testified that he has known plaintiff for twelve years as an officer on the beat where Andy's Bar is located. He described her as a decent, honest and trustworthy person, who aided him in a

murder investigation. A neighbor, Jean Berzinski, testified that she has known Plaintiff for seventeen years and she is a wonderful person who helps everybody.

5. Plaintiff is a reputable and hard-working person who has led a constructive and useful life since entering the United States and possesses the necessary qualifications to be a United States citizen. The issue presented is whether Plaintiff has met her burden of proving that she possesses the "good moral character" necessary for citizenship despite providing false information on her naturalization petition and at a naturalization interview.

## C. Naturalization Application.

6. On or about September 1, 1994, Plaintiff went to the Polish Welfare Association to seek assistance in preparing an Application for Naturalization ("Application"). (Dx.A.). Immigration Counselor, Weronika Gowin ("Gowin"), testified that she prepared the Application by asking Plaintiff questions in both English and Polish, typing the form, and marking the necessary boxes.

7. Question 15b. on the Application asks the following question:

Have you ever been arrested, cited, charged, indicted, convicted, fined or imprisoned for breaking or violating any law or ordinance excluding traffic regulations?

8. When asked question 15b. by Gowin, Plaintiff explained that in November, 1991, she had been arrested as the owner of the bar along with two women who were modeling lingerie at the bar while selling raffle tickets. Plaintiff explained to Gowin that she had appeared in court and the charges were "thrown out" and that her lawyer told her everything was "okay." Based on this information, and without conducting any further investigation, Gowin told Plaintiff that she was not required to disclose the arrest to INS. Gowin checked the "no" box in response to question 15b. Plaintiff signed the Application under oath and it was submitted to the INS by the Polish Welfare Association. At no time

did Plaintiff seek to withhold any information regarding the arrest from Gowin. Gowin acknowledged at trial that she had completed the form in error and had wrongly advised Plaintiff to deny to INS that she had ever been arrested.

## D. First INS Hearing.

9. On January 29, 1996, Plaintiff met with Carissa Sheffler ("Sheffler"), an INS District Adjudications Officer, to discuss her Application. Prior to the meeting, Sheffler had reviewed Plaintiff's permanent file and had in her possession an FBI report which disclosed that Plaintiff had been arrested by the Chicago Police Department on November 28, 1991 for gambling and that Plaintiff had been fingerprinted in connection with the charge. (Dx.B). The FBI report contained no information regarding disposition of the arrest.

10. Sheffler swore Plaintiff in and reviewed every question in the Application with her. When Sheffler came to question 15b., she asked several additional questions of Plaintiff to give her an opportunity to change her answer. Plaintiff denied that she had ever been held responsible for any gambling problems at her bar. She denied she had ever been fingerprinted. She denied having been to court for other than traffic problems and she denied she had ever been arrested. Plaintiff reinitialed and again signed the application under oath.

11. The Court finds that, although those statements were not true, Plaintiff was not motivated with the subjective intent of deceiving the INS to obtain immigration or naturalization benefits. Plaintiff believed that, because the charges had been dismissed, her answers were correct because she had been advised by Gowin to provide those answers.

12. The Court finds that but for Gowin's erroneous advice, Plaintiff would have fully disclosed the arrest to INS on her Application, as she had disclosed it to Gow-

in at the time the Application was prepared.

13. It was the practice of the Polish Welfare Association to submit the Application as part of a group and to sometimes complete part 12 of the Application, the signature, name and address of the preparer if someone other than the applicant, which would have disclosed that Gowin had prepared the Application. This was not done in this case.

### E. Denial of Application and Request for Second Hearing.

14. On May 1, 1996, the INS issued a denial of Plaintiff's Application on the grounds that she gave false testimony for not revealing that she had been arrested on November 28, 1991 for gambling. (Dx. C).

15. Plaintiff contacted Gowin to discuss this matter and Gowin acknowledged that she had made a mistake in the way she had completed the Application and in the advice she had given to Plaintiff. Gowin tried to rectify this problem during one of her regular weekly meetings with INS officials, but to no avail.

16. On July 19, 1996, Plaintiff filed a request for hearing on denial decision and included a certified record of the disposition of the criminal matter. (Dx.D).

17. A second hearing was held on February 18, 1999 with District Adjudications Officer, Joyce B. Woods ("Woods").

18. Woods testified that she had Plaintiff complete a new application. (Dx.E). In the second application, Plaintiff answered "yes" to question 15b. and clearly recounted the incident to Woods. Because item 12 of the original Application did not indicate that the Polish Welfare Association had completed the Application, Woods assumed that Plaintiff completed the form on her own. Plaintiff explained to Woods that the Polish Welfare Association had told her that she did not have to disclose the arrest.

19. On August 5, 1999, the INS denied Plaintiff's second Application. (Dx.F).

### F. The Litigation.

20. Plaintiff filed this action for declaratory and injunctive relief seeking *de novo* review of the denial of her Application for United States citizenship.

21. The Court finds Gowin to be a highly credible witness who acknowledged that she had originally caused this entire problem for Plaintiff. Gowin is to be commended for her candor.

22. The Court finds that Plaintiff was not experienced in preparing citizenship applications. Plaintiff is a truthful person who made disclosure to Gowin for the purpose of seeking U.S. citizenship. Although Plaintiff relied upon Gowin's erroneous advice in the first Application, she has fully cooperated in all later proceedings and accurately answered question 15b. in her second Application and in her second INS hearing.

23. The unfortunate series of events surrounding Plaintiff's Application does not change the fact that Plaintiff has proven she is a person of good moral character and that she did not give false testimony for the purpose of deceiving the INS to obtain benefits under the Immigration and Naturalization Act.

## II. CONCLUSIONS OF LAW

### A. Issue Presented

The legal issue presented is whether Plaintiff should be denied citizenship on the grounds that she lacked good moral character when she failed to disclose an arrest on her Application because of the erroneous advice of an experienced immigration counselor. The Court holds that Plaintiff's immigration Application should be granted.

### B. Jurisdiction and Burden of Proof

This Court has jurisdiction pursuant to 8 U.S.C. § 1421(c). Review of the case is *de novo. Id.*

In this naturalization proceeding, Plaintiff bears the burden to show, by

a preponderance of the evidence, that she is eligible in every respect to become a United States citizen, and any doubts are resolved in favor of the United States. *Berenyi v. Dist. Dir., Immigration and Naturalization Serv.*, 385 U.S. 630, 637, 87 S.Ct. 666, 671, 17 L.Ed.2d 656 (1967). "The freedoms and opportunities secured by United States citizenship long have been treasured by persons fortunate enough to be born with them, and are yearned for by countless less fortunate. Indeed, citizenship has been described as 'man's basic right for it is nothing less than the right to have rights'." *Fedorenko v. U.S.*, 449 U.S. 490, 522, 101 S.Ct. 737, 755, 66 L.Ed.2d 686 (1981). Because the right to become an American citizen is such a precious one, no less precious than the right to liberty and life, there must be strict compliance with all the congressionally imposed prerequisites before conferring citizenship. *Fedorenko v. U.S.*, 449 U.S. at 506–507, 101 S.Ct. at 747. Thus, there is no materiality requirement as it relates to false testimony. *Kungys v. U.S.*, 485 U.S. 759, 779, 108 S.Ct. 1537, 1551, 99 L.Ed.2d 839 (1988).

■ In contrast, during a denaturalization proceeding in which the government is seeking to divest the naturalized citizen of his American citizenship, a heavy burden rests on the government to show by clear, unequivocal and convincing evidence that the person is unworthy of the citizenship previously conferred. *Kungys v. U.S.*, 485 U.S. at 771–772, 108 S.Ct. at 1547. Under these circumstances, the court imposes a materiality standard to determine whether naturalization was procured "illegally," by the "concealment of a material fact," or by "willful misrepresentation" as set forth in 8 U.S.C. § 1451(a). *Id.* Any doubts as to the facts or law are to be construed "as far as reasonably possible in favor of the citizen." *Fedorenko*, 449 U.S. at 523, 101 S.Ct. at 755.

**C. Relevant Statutes**

The relevant statutory requirements for naturalization that pertain to this case are as follows:

No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a).

The statute further defines good moral character:

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

(1) a habitual drunkard;

(2) Repealed....

(3) a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D) [regarding prostitution], (6)(E) [regarding smugglers of illegal aliens], and (9)(A) [regarding aliens previously removed] of section 1182(a) of this title; or subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana), if the offense de-

scribed therein, for which such person was convicted or of which he admits the commission, was committed during such period;

(4) one whose income is derived principally from illegal gambling activities;

(5) one who has been convicted of two or more gambling offenses committed during such period;

(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter;

(7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;

(8) one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43) of this section).

The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character.

8 U.S.C. § 1101(f).

## D. Case Law Under 8 U.S.C. § 1101(f)(6)

The government contends that because Mrs. Plewa gave false testimony to the INS officer, she should be denied citizenship because she fails the requirement set forth in § 1101(f)(6) to qualify as someone possessing good moral character.

■ The issue presented is whether testimony that is false due to a misunderstanding and incorrect advice is sufficient to deny citizenship for lack of good moral character, or whether Congress intended to deny citizenship only in those instances where an applicant shows an intent to deceive the INS officer in order to gain citizenship. This Court holds that false testimony coupled with an intent to deceive for the purpose of obtaining citizenship or other benefits is required in order

to deny a citizenship application under 8 U.S.C. § 1101(f)(6).

In *Kungys,* the Supreme Court addressed this same issue, indicating that only falsity in an effort to lie or deceive is grounds to deny citizenship for lack of good moral character.

[8 U.S.C. § 1101(f)(6) ] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. We think it means precisely what it says.

The absence of a materiality requirement in § 1101(f)(6) can be explained by the fact that its primary purpose is not (like § 1451(a)) to prevent false pertinent data from being introduced into the naturalization process (and to correct the result of the proceedings where that has occurred), but to identify lack of good moral character. The latter appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception....

It is only dishonesty accompanied by this precise intent that Congress found morally unacceptable. Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character. *Kungys,* 485 U.S. at 780, 108 S.Ct. at 1551. Thus, the Supreme Court requires a "lie" or "dishonesty" with the "subjective intent of obtaining immigration benefits."

Although there are several cases in which the courts have denied citizenship to aliens for false testimony, these cases are distinguishable. In *Berenyi,* the Supreme Court upheld a denial of naturalization because an alien did not disclose the fact that he was a member of the Communist Party in order to facilitate his naturalization. *Berenyi,* 385 U.S. at 638, 87 S.Ct. at 671. The district court found that Plaintiff had

lied to obtain American citizenship and there were no mitigating circumstances.

In *Kovacs v. U.S.*, 476 F.2d 843 (2nd Cir.1973), the Plaintiff was denied naturalization for false testimony when he claimed he was not a homosexual, had never been a homosexual, and never engaged in fellatio. In the face of these denials, the hearing examiner introduced into evidence an affidavit signed by Plaintiff which directly contradicted these denials along with a medical certificate diagnosing plaintiff as a "psychopathic personality—homosexual"; and had been deemed as unfit for military service due to a classification of "moral reject." *Id.* at 844. In upholding the lower court's denial of citizenship, the court noted that it was the plaintiff's "lack of candor under oath" not his sexual activities, that precluded a finding of good moral character under 8 U.S.C. § 1101(f)(6). *Id.* at 845. This case is distinguishable for several reasons. First, there were no mitigating circumstances surrounding any of the denied activities of the plaintiff. Second, the plaintiff lied on his own accord, not on the erroneous advice of a person experienced in the immigration field. And third, plaintiff did not seek a trial *de novo* in the district court, as was his right.

Similarly, in *Del Guercio v. Pupko*, 160 F.2d 799 (9th Cir.1947), an alien was denied naturalization for falsely testifying that she had never been "arrested or charged with violation of any law of the United States or State or any city ordinance or traffic regulation" when, in fact, she had been convicted twice. She explained that she falsely testified because she thought that had she revealed the incident, her application would have been denied. *Id.* Likewise, in *In re Haniatakis*, 376 F.2d 728 (3rd Cir.1967), the court upheld a denial of naturalization because a woman stated that she was unmarried, despite the fact that she was married to an alien who had been arrested for illegal entry into the United States, fearing that revealing her marriage would delay her naturalization.

In contrast, in a case with similar facts to the one at hand, the Second Circuit held that citizenship must be granted to an alien who failed to disclose a previous Declaration of Intention upon the erroneous advice of a woman at the information desk at the naturalization office that he did not need to disclose it. *Petition of Zele*, 140 F.2d 773 (2nd Cir.1944). In that case, Zele relied on the erroneous advice of a naturalization lawyer, who fraudulently completed and forwarded to the INS a Declaration of Intention in 1931 with false information. *Petition of Zele*, 127 F.2d 578, 579 (2nd Cir.1942). The lawyer was later convicted for fraudulent naturalization practices. *U.S. v. VanRiper*, 113 F.2d 929 (2nd Cir.1940). When the alien attempted to complete another Declaration of Intention three years later in 1934, he inquired of the woman at the information desk of the INS whether he should disclose his previous erroneous Declaration of Intention. She told him, that "it would not be necessary to mention [his] previous first paper, since it was admittedly invalid." *Zele*, 127 F.2d at 579. Therefore, he stated on the 1934 form, "I have not heretofore made a declaration of intention." *Id.* The petitioner later informed the director of the INS of the facts surrounding the previous declaration. In an effort to fully disclose all previous filings, the petitioner incorporated his 1934 declarations of intention and statements therein, although they were false, into his 1940 petition. Due to this unfortunate series of events, the trial court denied the petition on the grounds that Zele falsely testified and therefore lacked good moral character. The Second Circuit reversed the lower court's denial and directed it to grant the petition. Despite the fact that the 1934 Declaration of Intention contained factually inaccurate information, the court found that the petitioner "believed he was making accurate and truthful statements in his ... declarations of intention in 1934." *Zele*, 127 F.2d at 579. The court further found that "he incorporated that declaration in his petition in 1940 ... in order to give literal

compliance with the provision of [the statute] rather than as a planned deception." *Zele*, 140 F.2d at 776.

Although there is no materiality requirement in 8 U.S.C. § 1106(f)(6), based on these cases and the purpose of the statute, it seems incongruous that Congress would consider an innocent mistake, misinterpretation, or incorrect statement as grounds to disqualify an otherwise upstanding person for American citizenship when the speaker had no deceitful intent. Often times, when people immigrate to this country, it is not under the most ideal of circumstances. Misstatements may be made to the INS officials for facts such as wedding dates or birth dates to avoid embarrassment, and last names may have been "Americanized" to avoid persecution. *Zele*, 140 F.2d at 776 (holding that use of an American version of a Czechoslovakian name is not grounds for denial of citizenship for lack of good moral character). These are not the type of circumstances under which Congress contemplated one would be deemed as lacking in good moral character. *Kungys*, 485 U.S. at 780, 108 S.Ct. at 1551 (noting that willful misrepresentations because of embarrassment, fear, or a desire for privacy are not sufficiently culpable to brand the applicant as someone who lacks good moral character.) Congress does not require sainthood to qualify as someone worthy of good moral character.

Similarly, when Plaintiff with a long history of good moral character goes to a service organization for help to attain citizenship, discloses to an experienced immigration counselor information surrounding an arrest, receives erroneous advice from that counselor that the arrest need not be disclosed, and then relies on the advice from this counselor in providing testimony before the INS, this does not disqualify Plaintiff from meeting the prerequisite of good moral character under 8 U.S.C. § 1101(f)(6).

■ The instant case is clearly distinguishable from *Kovacs, Del Guerico, Haniatakis,* and *Berenyi.* Plaintiff, being inexperienced in the naturalization application process, went to an experienced immigration counselor for assistance to guide her through the long and confusing process. Plaintiff did not conceal her arrest and the facts surrounding her arrest from Gowin, the immigration counselor, nor did Plaintiff ask her not to disclose it to the INS. Quite the contrary, Gowin translated the English application into Polish for Plaintiff and then Gowin completed the application based on Plaintiff's answers—except for question 15b. When Gowin asked Plaintiff question 15b., Plaintiff was forthright and disclosed the gambling arrest incident to her. Plaintiff told her she was arrested, taken to the police station, made an appearance in court, and that the case was dismissed and thrown out, and that her lawyer told her that her record was clear and that there was no record of it. Instead of disclosing this information by marking the box labeled "yes," Gowin marked the box labeled "no." Instead of inquiring further, as an experienced immigration counselor would be expected to do, she simply told Plaintiff that the incident need not be disclosed. Plaintiff had a reasonable basis to rely on the advice from Gowin. Gowin was an accredited immigration counselor with the Polish Welfare Association, a service organization well known in the Polish community for helping Polish aliens attain naturalization. Gowin had seven years of experience at the time she met Plaintiff and had processed thousands of petitions. In short, Plaintiff did disclose the incident to Gowin. She did not try to hide or deceive Gowin or the INS. She simply followed the erroneous advice given to her by Gowin.

Despite her credentials, it is clear from the testimony of Gowin, who is not a lawyer, that she misunderstood not only the law but also Plaintiff's account of the incident. When Gowin found out that her advice was incorrect, she did everything she could to rectify the problem. She contacted the INS, informed them that it was entirely her fault, offered to write a

letter to that effect, and helped Plaintiff to complete an appeals application. The INS refused to accept Gowin's explanation and told her that Plaintiff could explain it herself next time she came in.

Plaintiff also did everything she could do to clear up the problem. She completed an appeals application in which she marked "yes" to question 15b. and attended an appeals hearing. However, when Plaintiff tried to explain the whole incident and why it was not disclosed in the first place, instead of giving Plaintiff a *de novo* hearing taking into account the totality of the circumstances, the INS appeals officer essentially viewed the hearing as an abuse of discretion review and confined her analysis to whether the first district adjudication officer had a reason to deny Plaintiff citizenship. Finding that the first officer had reason to deny citizenship, the appeals officer denied Plaintiff's second application.

Looking at the totality of the circumstances, Plaintiff had no subjective intent to deceive INS to obtain citizenship status when she gave her false testimony based on Gowin's erroneous advice. The Court now looks to other facts to determine whether or not she is a person of good moral character.

**E. Other Factors in Determining Good Moral Character**

Plaintiff does not fall under any of the other classes in 8 U.S.C. § 1101(f)(1) through (8) that would preclude her from being found as a person of good moral character. Indeed, the government agrees that, but for Plaintiff's false testimony, she would not have been denied citizenship. However, the last sentence of § 1101(f) states: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character." Thus, the Court looks at other facts that may preclude a finding of good moral character.

■ In determining good moral character, the courts quite realistically have rec-ognized that "[w]e do not require perfection in our new citizens." *Klig v. U.S.,* 296 F.2d 343, 346 (2nd Cir.1961). The standard of good moral character in the naturalization context is that "petitioner's character must measure up to that of the average citizen in the community in which he resides before he is entitled to citizenship by naturalization." *Brukiewicz v. Savoretti,* 211 F.2d 541, 543 (5th Cir.1954). Good moral character is also defined as: "A pattern of behavior that is consistent with the community's current ethical standards and that shows an absence of deceit or morally reprehensible conduct." BLACK'S LAW DICTIONARY 701 (7th ed.1999).

■ In determining whether a petitioner possesses good moral character in a naturalization proceeding, "a wide discretion is vested in the trial judge." *Brukiewicz* at 543. In naturalization proceedings, courts have considered the totality of the circumstances, including a longitudinal analysis of a petitioner's life and the credentials of those giving testimony on her behalf. *Klig,* 296 F.2d at 347; *Application of Murra,* 178 F.2d 670, 674–677 (7th Cir. 1949).

In *Murra,* the Seventh Circuit reversed and remanded a lower court's decision to deny naturalization holding that a refusal to answer questions surrounding the grounds for his divorce and how long he had lived with his current wife before marriage could not form a basis for denial of citizenship. *Id.* Although the court stated that the burden is on the petitioner to establish good moral character only in the five years before filing the application, the Seventh Circuit looked to the life of the petitioner. The court noted that the petitioner had received his bachelor and doctorate degrees at the University of Chicago; had been the recipient of several scholarships and awards; had accepted prestigious positions with Yale University, University of Chicago, and University of Wisconsin; had lived with his wife for four to five weeks prior to marriage; had several prestigious people testify on his behalf

that he was an upstanding individual; and even had his ex-mother-in-law testify that he was "of the highest character." *Id.* at 674–676. After citing a summary of cases in which courts approved applications despite less than ideal circumstances, the court pointed out that the cases "disclose the length, in some instances apparently extreme, to which courts have gone in approving admission in spite of some moral deficiency." *Id.* at 678.

### F. Plaintiff Has Good Moral Character

 "The Swiss philosopher Amiel tells us that 'character is an historical fruit and is the result of a man's biography.'" *Chaunt,* 364 U.S. at 357, 81 S.Ct. at 151 (Clark, J., dissenting). Looking at Plaintiff's biography, the Court finds a person of good moral character. She immigrated to this country from Poland and became a permanent resident in 1976 at the age of twenty-one. There is no evidence of previous criminal history prior to her arrival in this country. Since coming to this country, she has married her husband, Andrzej Plewa. Plaintiff and her husband have raised two children, now teenagers, who were born in this country. They have instilled good values in their children. The Plewas have owned their own business since 1984. Plaintiff has contributed to the community by regularly attending church, helping the poor and those in her neighborhood, assisting a Chicago police officer in a murder investigation, and presumably providing employment to workers in their family owned business. In short, people like Plaintiff are the backbone upon which this country was built: hard-working, decent people who come to this country with the hope of a better life, willing to contribute to society by rolling up their sleeves, build a business, take care of those less fortunate, and learn a new language and culture. Plaintiff will make a fine American citizen. Would that everyone who is a natural born citizen by the mere accident of birth be as upstanding as Plaintiff. This Court concludes that Mrs. Plewa meets all the requirements necessary to qualify for American citizenship.

The Court grants Plaintiff's application for citizenship and welcomes her to the great melting pot of these United States.

### *CONCLUSION*

For the foregoing reasons, **the Court finds in favor of the Plaintiff, Krystyna Plewa, and grants Plaintiff's application for naturalization.**